IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

DETRIC CONWAY                                                                    PLAINTIFF

v.                                        Civil No. 6:15-cv-06028

PAUL NORRIS and
SCOTT LAMPINEN                                                           DEFENDANTS

## MEMORANDUM OPINION

Plaintiff Detric Conway proceeds in this matter *pro se* and *in forma pauperis* pursuant to

42 U.S.C. § 1983. Currently before the Court is Defendants Paul Norris and Scott Lampinen's

Motion for Summary Judgment (ECF No. 51). Plaintiff filed a response. (ECF No. 59).

Defendants filed a reply. (ECF No. 60). Plaintiff filed a sur reply. (ECF No. 61). The Court finds

the matter ripe for consideration.

## I.  BACKGROUND

On July 13, 2010, Plaintiff was arrested and charged with the robbery of the Hometown

Pharmacy in Hot Springs, Arkansas.[1] (ECF Nos. 53-1, at 1; 53-3, at 10-11). Video surveillance

of the robbery showed four African-American men involved in the robbery, two of them holding

handguns. (ECF Nos. 59-1, at 1; 53-3, at 33). One man, wearing a red and blue Atlanta Braves

cap, yellow gloves, black pants, and a black shirt, held a handgun on the pharmacy employee,

Sharay Durbin. (ECF No. 59-1, at 1). Another man, dressed in light colored pants, a black glove

on his left hand and a white sock on his right hand, also held a handgun. (ECF No. 53-3, at 33).

---

[1] Plaintiff was convicted of robbing two pharmacies in Hot Springs—Hometown Pharmacy and Phil's Pharmacy.
(ECF No. 53-1). However, only the facts related to the Hometown Pharmacy robbery are relevant to this case. The
facts relating to the Phil's Pharmacy robbery are not relevant and therefore are not discussed in this Memorandum
Opinion.

The man in light pants filled a dark colored square tote with medications from the pharmacy and left with the tote. (ECF No. 53-3, at 33).

After a short foot pursuit, Plaintiff was arrested immediately after the robbery, still wearing the light-colored pants. (ECF No. 53-3, at 33-34). Near where Plaintiff was captured was the dark tote containing a portion of the medications, a white sock, and a .40 caliber handgun. (ECF No. 53-3, at 34). Testing by the Arkansas State Crime Laboratory confirmed that the sock contained DNA from Plaintiff. (ECF No. 53-3, at 36). Months after Plaintiff was arrested and charged with the robbery, the Hot Springs Police Department found a BB gun on top of a building near the escape route from the pharmacy. (ECF No. 53-3, at 39). On July 31, 2012, Plaintiff pled guilty to the robbery. (ECF No. 53-1).

On July 5, 2010, Jacquard Clark was found dead at Bailey Place Apartments from a gunshot wound to the head. A .40 caliber shell casing was collected at the scene of the homicide. The Arkansas State Crime Laboratory determined that the shell casing came from the same .40 caliber gun seized as evidence in the Hometown Pharmacy robbery. (ECF No. 53, at 1). On October 13, 2010, Larry Thompson was interviewed by Defendants about the murder while he was incarcerated in the Pike County Detention Facility, and Thompson signed a written statement. (ECF No. 53-4). Thompson said he had known Plaintiff for most of his life. He said that about a week before Clark's murder, Plaintiff asked Thompson about "doing a job and hitting this guy" who lived at and sold marijuana at the Bailey Place Apartments. Plaintiff told Thompson that he had a key to Clark's apartment and had been there before. Thompson said he turned down the job because he did not need the money. Thompson said that Plaintiff was carrying a "short forty" at the time. Thompson further stated that a few days after the murder, he was sitting in a car in front of Plaintiff's mother's house. Thompson said that Plaintiff told him that they "hit that dude at the Bailey Place [A]partments and that he shot the dude in the face." (ECF No. 53-4).

On January 13, 2011, Plaintiff was charged with capital murder in connection with the death of Clark. On May 17, 2013, Plaintiff was acquitted of the capital murder charge. Plaintiff is currently incarcerated in the Yazoo City Medium Federal Correctional Facility, serving a sentence for the armed robbery of Hometown Pharmacy

Plaintiff filed this lawsuit on May 30, 2015. (ECF No. 1). After preservice screening, Plaintiff's claims against three other defendants were dismissed and Plaintiff's claims against Defendants Norris and Lampinen remained for further consideration. Plaintiff alleges that Defendants violated his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment constitutional rights as a result of their actions or inactions during his capital murder case in Garland County, Arkansas, Case No. CR-2011-159-1. (ECF No. 1).

Specifically, Plaintiff alleges that Defendant Norris, a detective with the Hot Springs Police Department, lied on the affidavit for his arrest warrant, coerced a witness to make a false statement, withheld exculpatory evidence, and attempted to have the crime lab fabricate evidence. He alleges that these actions were racially motivated, as evidenced by statements allegedly made by Defendant Norris. (ECF No. 1, at 3). Plaintiff alleges further that Defendant Lampinen, also a detective with the Hot Springs Police Department, was involved in the investigation, witnessed the racial slurs, and knew the witness was making a false statement, but did nothing. (ECF No. 1, at 5). Plaintiff also alleges that Defendant Norris retaliated against him because of his presence at his brother's separate murder trial.

On September 6, 2016, Plaintiff filed a motion for production of the trial transcripts from his state capital murder trial. Plaintiff asserted that the transcript would support his constitutional claims against Defendants. (ECF No. 26). On September 12, 2016, the Court granted Plaintiff's request and ordered Defendants to provide a copy of the transcript to Plaintiff. (ECF No. 27). On November 8, 2016, the Court entered a second order, noting that research by the Court and

Defendants indicated that Plaintiff's three-day capital murder trial had been recorded but never transcribed. On January 4, 2017, the Court entered an order stating that the Court would bear the cost of limited transcription, and directed Defendants to obtain the testimony of the following witnesses from Plaintiff's criminal trial, as requested by Plaintiff: Michael J. West, Scott Lampinen, Paul Norris, and crime lab officials Stephen Erickson, Jennifer Floyd, Mandi Wertenberger, and Mary Simonson. (ECF No. 39).

On August 23, 2017, Defendants filed the instant Summary Judgment Motion, and Plaintiff responded. Defendants filed a reply. On December 4, 2017, Plaintiff filed a sur reply, along with a Statement of Facts. Plaintiff did not include any portion of the trial transcript with his response or sur reply. Plaintiff also filed a motion requesting leave of Court to file a sur reply and to file an amended response to the summary judgment motion. (ECF No. 63). The Court granted this motion and instructed Plaintiff to file his amended documents by December 28, 2017. (ECF No. 64).

On January 9, 2018, the Court entered a Show Cause Order after Plaintiff failed to file the amended documents by the Court-imposed deadline. (ECF No. 65). Neither the order granting leave for the amendment nor the Show Cause Order were returned as undeliverable. Plaintiff's response to the Show Cause Order was due January 24, 2018. Plaintiff did respond to the Show Cause Order. Because Plaintiff has already filed a response and a sur reply in the case, the Court will utilize those documents as his complete response to the Summary Judgment Motion.

## II. STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607. "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

Defendants argue as a preliminary matter that Plaintiff's case against them should be dismissed because it is barred by the statute of limitations.  (ECF No. 60).  In the alternative, Defendants advance the following arguments that Plaintiff's individual capacity claims should be dismissed:  (1) Defendants had probable cause to arrest Plaintiff; (2) Defendants did not lie on an affidavit for Plaintiff's arrest; (3) Plaintiff cannot show that Defendants attempted to have the crime lab fabricate evidence; (4) Plaintiff cannot show that Defendants coerced a witness to make a false statement; (5) Plaintiff's claim that Defendants failed to disclose exculpatory evidence fails because he was not convicted and the evidence in question—a BB gun—was not actually exculpatory; (6) Defendants' actions in charging Plaintiff with capital murder were not racially motivated; (7) Plaintiff's First Amendment retaliation claim must fail because Plaintiff was charged with murder before he engaged in the protected activity; (8) Plaintiff's claim against

Defendant Lampinen fails because, outside of the excessive force context, there is no clearly established law regarding a duty to intervene; (9) Plaintiff did not state an Eighth Amendment claim; (10) Defendants are entitled to qualified immunity; and (11) Plaintiff cannot demonstrate that the City of Hot Springs failed to adequately train its employees. (ECF Nos. 52, 60)

Defendants argue that Plaintiff's claims are barred by the statute of limitations based on the holding in *Jones v. McLemore*, 2014 Ark. App. 147. (ECF No. 60, at 1-2). In *Jones*, the plaintiff asserted claims of malicious prosecution, defamation, conspiracy, and violations of his civil rights under the Arkansas Civil Rights Act ("ACRA") for an unsuccessful criminal prosecution. *Jones v. McLemore*, 2014 Ark. App. 147, 1. The trial court granted summary judgment on the malicious prosecution claim and found that the ACRA claims were barred by the statute of limitations. *Id* at 1-2. The ACRA claims included failure to disclose exculpatory evidence, submission of false affidavits, and due process violations. *Id.* at 7-8. The Arkansas Court of Appeals affirmed the trial court's finding that the ACRA claims were time-barred, stating:

> [W]hile the alleged acts that he relies upon to make his ACRA claims may well be encompassed within the overall tort of malicious prosecution, it is the separate acts that control the limitations period. . . . The probable-cause affidavits executed by [defendant] were prepared in 2007 and [plaintiff's] actual arrest took place in February 2008, both of which occurred more than three years before he filed his lawsuit. The actual trial and his acquittal were not necessary prerequisites to establish his ACRA claim.

*Id.* at 8-9.

Defendants point to *Jones* and argue that Plaintiff's claims accrued and began to run, at the latest, on January 13, 2011, when he was arrested. Plaintiff argues that the alleged violations raised in this case were not revealed to him until discovery was complete in his capital murder case, and testimony was provided at trial. (ECF No. 61, at 2). Plaintiff asserts that discovery in his capital murder case was not completed until approximately two weeks before trial, or no earlier than May 2013. (ECF No. 61, at 3). Plaintiff subsequently filed this case on May 30, 2015.

Section 1983 does not contain its own statute of limitations. Instead, causes of action under section 1983 are governed by "the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987). In Arkansas, the three-year personal injury statute of limitations found in Ark. Code Ann. § 16-56-105(3) is applicable to section 1983 cases. *See Miller v. Norris*, 247 F.3d 736, 739 (8th Cir. 2001). The date when a section 1983 cause of action accrues "is a question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis in original); *see also Montin v. Estate of Johnson*, 636 F.3d 409, 413 (8th Cir. 2011). The United States Supreme Court recently discussed accrual of a section 1983 claim for unlawful pretrial detention in violation of the Fourth Amendment, stating, "[i]n support of [the plaintiff's] position, all but two of the ten Courts of Appeals that have recognized a Fourth Amendment claim like his have incorporated a 'favorable termination element' and so pegged the statute of limitations to the dismissal of the criminal case." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 921 (2017).

Defendants' reliance upon the *Jones* case is misplaced, and this Court declines to find that Plaintiff's claims are time-barred based on that precedent. Although the Eighth Circuit has not yet had the opportunity to address the recent *Manuel* case, the language used by the Supreme Court in support of the "favorable termination element" is clear.[2] Plaintiff's section 1983 claims accrued when he was acquitted of the murder charge on May 17, 2013. Plaintiff filed his case on May 30,

---

[2] Since the *Manuel* case was decided, six federal district courts in other jurisdictions have cited it in support of the premise that a Fourth Amendment claim for malicious prosecution accrues when the underlying criminal case is favorably terminated. *See Clark III v. Wills*, Case No. 16-3119-SAC, 2017 WL 5598261 (D. Kan. Nov. 21, 2017); *Watson v. Mita*, Case No. 16-40133-TSH, 2017 WL 4365986 (D. Mass. Sept. 29, 2017); *Brown v. Louisville Jefferson Cnty. Metro Gov't*, Case No. 3:16-cv-460-DJH, 2017 WL 4288886 (W.D. Ky. Sept. 27, 2017); *Quintana v. City of Philadelphia*, Case No. 17-996, 2017 WL 3116265 (E.D. Pa. July 21, 2017); *Annan-Yartey v. Muranaka*, Case No. 16-00590, 2017 WL 1243499 (D. Hawai'i Apr. 3, 2017); *Nowacki v. Town of New Canaan*, Case No. 3:16-cv-00407(JAM), 2017 WL 1158239 (D. Conn. Mar. 28, 2017).

2015. Thus, the Court finds that his Complaint was filed well within the three-year personal injury statute of limitations set forth by Arkansas law.

Therefore, the Court will not dismiss Plaintiff's claims as time-barred by the applicable statute of limitations. The Court will separately address Defendants' other summary judgment arguments. Because the events of the Hometown Pharmacy robbery were used to establish probable cause for the capital murder charge, the relevant undisputed events concerning the robbery and the murder will be described prior to addressing each argument.

**A. Facial Validity of the Probable Cause Affidavit**

It is well established that the Fourth Amendment prohibits citizens from being arrested without probable cause. *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999). Whether police have probable cause at the time of an arrest is a question of law for a court to decide. *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010). "[T]he probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000).

"Probable cause to arrest exists when, at the moment the arrest was made . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996). "Probable cause is to be assessed in terms of the circumstances confronting a reasonably cautious police officer at the time of the arrest, and the arresting officer is entitled to consider the circumstances, including arguably innocent conduct, in light of his training and experience." *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986) (quoting *United States v. Wallraff*, 705 F.2d 980, 990 (8th Cir. 1983)); *see also Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) (stating that "any later developed facts are irrelevant

to the probable cause analysis for an arrest").  Moreover, police officers are entitled to "substantial latitude in interpreting and drawing inferences from factual circumstances."  *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997).  "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

The probable cause affidavit in this case states that Jacquard Clark was killed by a gunshot wound to the head at 108 Bailey Place, Apartment C-3.  (ECF No. 53-2, at 1).  A .40 caliber shell casing was found at the scene of the murder.  The spent shell casing matched that of the .40 caliber handgun used in the Hometown Pharmacy robbery.  The affidavit further states:

> The surveillance video for the robbery showed a black male wearing light colored pants, a black glove on his left hand and a white sock on his right hand wielding a handgun. The video also shows this person filling a dark colored square tote and leaving with this tote.  Conway was arrested immediately after the robbery and after a short foot pursuit still wearing light colored pants.  Near where Conway was captured was the tote containing a portion of the medications stolen, a white sock and a .40 caliber handgun, a Glock Model 27.  The white sock and the weapon were sent to the Arkansas State Crime Laboratory.

> The Crime Lab reported the sock, with all scientific certainty, contained DNA from Detric Conway and the spent shell casing from the Jacquard Clark homicide scene, with all scientific certainty, came from this same .40 caliber handgun.

> Larry Thompson was interviewed on 10/13/10 and gave a signed statement concerning two meetings he had with Conway.  Thompson said "About a week before the murder up on Bailey Place Detric asked me about doing a job and hitting this guy up there."  He added "A couple days after the murder I was sitting in a car out in front of Detric's mother's house on Pullman Street.  Detric told me they hit that dude at the Bailey Place Apartments and that he shot the dude in the face."

(ECF No. 53-2, at 1).  Defendants both signed the affidavit.  A judge subsequently found that the affidavit demonstrated reasonable and probable cause for the issuance of an arrest warrant for Plaintiff.  (ECF No. 53-2, at 2).

The totality of facts in the affidavit provided probable cause to arrest Plaintiff for the murder of Jacquard Clark, and a neutral magistrate issued an arrest warrant based on the affidavit.

The fact that Plaintiff was ultimately acquitted of the murder charge is irrelevant to the issue of whether probable cause existed at the time of his arrest. *See Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993) (stating that whether or not the arrested person is found innocent is not material to the analysis). Thus, the Court finds that the affidavit, on its face, established probable cause for Plaintiff's arrest for capital murder. At this time, the Court must address Plaintiff's arguments that Defendants fabricated evidence or ignored exculpatory evidence that negates the probable cause established in the affidavit.

### B. Veracity of the Probable Cause Affidavit

As discussed above, when an alleged constitutional violation involves an arrest pursuant to a warrant, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt*, 565 U.S. at 546. However, when a police officer deliberately or recklessly makes false statements to demonstrate probable cause for an arrest warrant, the warrant may be invalidated under *Franks v. Delaware*, 438 U.S. 154 (1978). *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1311 (8th Cir. 2014). "To show reckless disregard for the truth, [courts] do not look simply at whether a statement included in the affidavit was true; rather, [courts] ask whether, when looking at all the evidence available to the officer, the officer must have entertained serious doubts as to the truth of his . . . statements or had obvious reasons to doubt the accuracy of the information he . . . reported." *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008) (internal quotation marks omitted). If there is evidence of recklessness, the probable cause affidavit is not automatically void; rather, the solution is to edit out the recklessly false information and then evaluate the corrected affidavit for probable cause. *See Bagby v. Bronhaver*, 98 F 3d. 1096, 1099 (8th Cir. 1998).

In his Complaint, Plaintiff alleges that Defendant Norris filed an "untruthful affidavit" in order to obtain an arrest warrant. (ECF No. 1, at 3). Plaintiff was deposed for this case on

November 14, 2016. (ECF No. 53-3). During the deposition, Plaintiff provided testimony concerning the statements in the affidavit. Plaintiff did not dispute the statement that the .40 caliber gun, tote, and white sock were found near where he was captured. (ECF No. 53-3, at 34). He did testify that the affidavit was different "from the first one" because "they said the gun was inside the black tote, but it wasn't. It was about right there with all the drugs. This is where we stashed all the drugs at. They fount [sic] the gun right there by the drugs." (ECF No. 53-3, at 34). Plaintiff testified that when he was sentenced, "David Harris . . . reworded it to where they don't have it in the tote." [3] (ECF No. 53-3, at 34-35). Plaintiff testified that the plea agreement for the Hometown Pharmacy robbery charge stated the gun was not in the tote. (ECF No. 53-3, at 35). Plaintiff did not dispute that his DNA was on the white sock. (ECF No. 53-3, at 36). Plaintiff also disputed that he had two meetings with Larry Thompson. (ECF No. 53-3, at 36-37).

Plaintiff was asked if there was anything else missing from the affidavit. Plaintiff testified that he had been carrying the toy BB gun at the time of the Hometown Pharmacy robbery, not the .40 caliber handgun. He heard that when the BB gun was found, it was given to the Hot Springs Police and Defendants told the crime lab not to test it for hair fiber. (ECF No. 53-3, at 39). Plaintiff agreed that police did not know about the BB gun until they charged him with murder, and therefore could not put it in the affidavit. (ECF No. 53-3, at 40).

Plaintiff further testified that Defendants left out of the affidavit information about a white Jeep Cherokee that left the murder scene minutes after shots were fired and Clark was killed. (ECF No. 53-3, at 39). Plaintiff testified that the Jeep was driven by Richard Johnson (a/k/a Ritchie Poo), one of his co-defendants in the Hometown Pharmacy robbery, who also had the .40 caliber handgun. Plaintiff further testified that "the whole reason they charged me was because of Larry

---

[3] A review of Plaintiff's criminal case for the robbery, *United States v. Conway*, Case No. 6:10-cr-60032-001, indicates that David Harris was one of the federal prosecutors for the case.

Thompson." (ECF No. 53-3, at 41). Plaintiff testified that if the police had investigated "instead of just taking Larry Thompson's word" they would have found that he did not kill Clark. (ECF No. 53-3, at 41-42).

Plaintiff's response to the instant Summary Judgment Motion states that Defendants "chose to go off the word of Thompson who was not an eyewitness to Clark's murder, only providing what amounted to a hearsay statement of Plaintiff's alleged admission to the murder, coupled with the murder weapon in close proximity upon Plaintiff's arrest." (ECF No. 59, at 5). Plaintiff cites the affidavit itself as evidence that the Hometown Pharmacy employee present at the time of the robberty, Sharay Durbin, explicitly told the police that Richard Johnson possessed the .40 caliber handgun. (ECF No. 59, at 4). Plaintiff further alleges that additional investigation would have revealed that he possessed a BB gun during the robbery. (ECF No. 59, at 5).

Plaintiff further alleges Defendants "fabricated the location of where the [.40 caliber] handgun was found to manufacture the corroboration necessary for probable cause." (ECF No. 59, at 7). Specifically, Plaintiff states the police report by Detectives Chem and Stockwell, who investigated the Hometown Pharmacy Robbery and recovered the evidence, states that the .40 caliber handgun was laying on top of the black tote, rather than inside of it as stated in the probable cause affidavit. (ECF No. 59-1, at 3). Plaintiff argues this suggests that the handgun was "simply thrown on top of the tote and never truly possessed by Plaintiff." (ECF No. 59, at 7). In his Statement of Facts, Plaintiff alleges, "[t]he .40 caliber handgun that was recovered by the Hot Springs Police Department was not inside the black tote, nor was it on top of the black tote, nor was the gun found within yards of the black tote that Plaintiff was said to be carrying."[4] (ECF No. 62).

---

[4] Plaintiff raises this allegation for the first time in his Statement of Facts, which he filed alongside his sur reply to the instant motion. Because the statement is contradicted by his previous allegations and testimony, as well as by the

The Court will now address each of the probable cause affidavit's alleged shortcomings that Plaintiff argues negates the probable cause established in the affidavit.

### 1. Location of .40 Caliber Handgun

Plaintiff argues that Defendants falsely stated in the affidavit the location of the .40 caliber handgun in order to create probable cause for his arrest for murder. In his deposition, Plaintiff did not dispute that the .40 caliber handgun, tote, drugs, and white sock were found near where he was captured. (ECF No. 53-3, at 34). He only disputed that the gun was inside the tote. (ECF No. 53-3, at 34).

Plaintiff's plea agreement in his criminal case for armed robbery states that he was seen on the surveillance video wearing light colored blue jeans, a gray-colored sweatshirt, and a white sock on his left hand. *See* Plea Agreement, *United States v. Conway*, Case No. 6:10-cr-60032-001 (W.D. Ark. Sept. 12, 2011), ECF No. 57, at 4. He was observed taking narcotics and placing them into a bag. Officers searching the streets near the robbery were flagged down by a citizen who stated that black males ran out of a wooded area and were running down Sunrise Street. An officer saw two black males running down Sunrise Street, throwing items taken from the pharmacy as they ran. Plaintiff and another suspect were subsequently apprehended and taken into custody. At that time, Plaintiff was wearing light colored blue jeans and no shirt. The other suspect was wearing an Atlanta Braves cap. The officers recovered a black tote bag, a black pistol, a white sock, a gray sweatshirt, and a portion of the narcotics taken from the pharmacy.

Plaintiff submitted the police report by Detectives Clem and Stockwell as an exhibit to his response to the instant motion. (ECF Nos. 59-1, at 3; 66). The report noted that evidence from the robbery had been "strown throughout several blocks."

---

other summary judgment evidence, the Court finds that no reasonable jury could believe this allegation and thus the Court will not consider it for summary judgment purposes. *See Scott*, 550 U.S. at 380.

> We first located a large black duffle bag containing several pills and a Glock .40 caliber Model 27 Serial # ENK893 laying on top of the bag. A black and white Foot Locker Brand plastic bag was located next to this filled with Narcotics. This was all located at 302 Sunrise in shrubbery in the southwest portion of the yard. Located at the southeast part of the yard (near the mailbox) was a black hooded sweater, a white doo rag and a pair of white Reebok brand batting gloves. Located in the yard at 300 Patricia was a blue knit style cap with eyeholes cut out in it. Located in the yard of 300 Patricia was a gray sweatshirt.

(ECF Nos. 59-1, at 3; 66).

Plaintiff also submitted the probable cause affidavit as an exhibit. (ECF No. 59-1, at 1-2). The affidavit states: "Located at 302 Sunrise Street was a black tote bag containing a handgun, a white sock and a portion of the narcotics along with a Foot Locker sales bag filled with narcotics located on the west side of the driveway." (ECF No. 59-1, at 1).

At first glance, the Court is troubled by the fact that the white sock—which was later found to have Plaintiff's DNA on it—was not mentioned in the report by Detectives Chem and Stockwell. However, Plaintiff's plea agreement states "a black tote bag, a black pistol, a white sock, a portion of the narcotics taken from the pharmacy and a gray sweatshirt" were recovered along the route where Plaintiff and another suspect were seen running. *See* Plea Agreement, *United States v. Conway*, Case No. 6:10-cr-60032-001 (W.D. Ark. Sept. 12, 2011), ECF No. 57, at 4. Further, in his deposition, Plaintiff did not dispute that the .40 caliber handgun, tote, drugs, and white sock were found near where he was captured. (ECF No. 53-3, at 34). He only disputed that the gun was inside the tote. (ECF No. 53-3, at 34). In his response, Plaintiff alleges that the gun was in close proximity to his arrest, and was found on top of the tote. (ECF No. 59, at 5, 7).

Viewing the evidence in the light most favorable to Plaintiff, the .40 caliber handgun was found near where Plaintiff was captured after the robbery, along with the black tote he was seen filling on the surveillance video, drugs taken from the pharmacy, and the white sock with his DNA on it. Whether the gun was on the tote bag, in the tote bag, or near the tote bag does not negate

the fact that it was found in the shrubbery at 302 Sunrise, in close proximity both to the location of Plaintiff's arrest and to other items linking him to the Hometown Pharmacy robbery.

Even if the Court assumes that the information was deliberately changed to place the gun inside the bag, rather than on top of the tote or near the tote, this location discrepancy does not affect the Court's probable-cause analysis. Assuming Plaintiff's statement of fact regarding the location of the handgun is correct, and that information in the affidavit is false, the Court must then edit out that false information and evaluate the corrected affidavit for probable cause. *See Bagby*, 98 F 3d. at 1099. After doing so, the affidavit states that a .40 caliber handgun was found in close proximity to a tote bag containing drugs and a white sock after Plaintiff had been seen throwing items during pursuit. Surveillance video showed Plaintiff placing drugs in the tote and wearing a white sock on one hand during the robbery. DNA analysis linked the white sock to Plaintiff. Crime lab analysis linked a spent shell casing from the murder scene to the .40 caliber handgun found with the tote. The officers also had a written statement from Larry Thompson linking Plaintiff to the murder and using a .40 caliber handgun. These facts are sufficient to establish probable cause for an arrest. *See Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1998) (stating that an officer may not ignore exculpatory evidence, but does not need to conduct a mini-trial before arresting based on credible eyewitness claims or other indicia of probable cause). Thus, the Court finds that this was not sufficient to negate the probable cause established in the affidavit.

## 2. Sharay Durbin's Statement

Plaintiff cites the probable cause affidavit itself as evidence that the pharmacy employee, Sharay Durbin, explicitly told the police that Richard Johnson possessed the .40 caliber handgun. The affidavit contradicts Plaintiff's allegation. A close review of the affidavit indicates Durbin identified Johnson as the person who held a gun to her, but she did not identify that gun as a .40 caliber. Because the surveillance video showed two men in the robbery carrying handguns,

Durbin's identification does not indicate that Defendants had notice that it was actually Johnson who carried the .40 caliber handgun.  Thus, the Court finds that Sharay Durbin's statement was not sufficient to negate the probable cause established in the affidavit.

### 3.  Discovery of BB Gun

At his deposition, Plaintiff responded to a question about whether anything was missing from the probable cause affidavit by stating that he had a BB gun during the Hometown Pharmacy robbery, and that it was not discovered until later.  However, Plaintiff conceded at his deposition that the BB gun was found long after he had been arrested and charged with the murder, and that Defendants could not have included the BB gun in their affidavit because they did not know it existed.  It is therefore irrelevant to the truthfulness of the probable cause affidavit.  Thus, the Court finds that the discovery of the BB gun was not sufficient to negate the probable cause established in the affidavit.

### 4.  Failure to Investigate White Jeep Cherokee

In his deposition, Plaintiff testified that Defendants did not include information in the affidavit concerning the existence of a white Jeep Cherokee that left the scene of the murder shortly after shots were fired.  Plaintiff testified that, if Defendants had investigated this, rather than accepting the word of Thompson, they would have known he did not murder Clark.  Plaintiff does not provide any evidence indicating the source or accuracy of that information, or show that either Defendant had that information at the time the affidavit was written.  *See Nat'l Bank*, 165 F.3d at 607 (stating that speculation and suspicion are insufficient to survive a motion for summary judgment).  Even assuming arguendo that Plaintiff had provided this information, it does not negate the probable cause established in the affidavit.

The Court has reviewed all alleged shortcomings in the probable cause affidavit and finds that none are sufficient to negate the probable cause established in the affidavit.  The Court now

will address Plaintiff's argument that Defendant Norris coerced a witness into making a false statement, that was also used to establish probable cause for his arrest.

### C. Witness Coercion

Plaintiff alleges Defendant Norris coerced Larry Thompson into making a false statement against Plaintiff, which, as discussed above, was then used as support for the probable cause affidavit. (ECF No. 1, at 3). Plaintiff alleges that Defendant Lampinen knew Thompson's statement was false, but told Plaintiff during the interrogation at the Bi-State Justice building that he would be "stuck" with the murder because he would not confess or implicate Thompson. (ECF No. 1, at 5).

In his deposition, Plaintiff testified that the only evidence he had of coercion was the fact that Thompson's statement was a lie and the fact that Thompson made the statement so that he could "get cut a deal" from Defendants Norris and Lampinen. (ECF No. 53-3, at 45). In his response, Plaintiff notes that Thompson was in custody facing a separate robbery charge. Plaintiff alleges that Defendants, "through leading questions, the threat of a life sentence, and the promise of being rewarded for implicating Plaintiff in Clark's murder," procured a false statement from Thompson that incriminated Plaintiff. (ECF No. 59, at 9). Plaintiff alleges that the coercion became evident during Thompson's testimony at Plaintiff's criminal trial.[5]

In sum, Plaintiff alleges that Larry Thompson lied in order to receive a favorable plea agreement. "The Fourteenth Amendment guarantees substantive due process, which prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002) (internal quotations omitted). "In reviewing police tactics to obtain a confession under the Due Process

---

[5] Plaintiff has not provided the Court with the transcript of Thompson's trial testimony.

Clause, we focus on the crucial element of police overreaching." *Sheets v. Butera*, 389 F.3d 772, 778 (8th Cir. 2004). "Whether particular interrogation techniques are unconstitutionally coercive depends on the totality of the circumstances, including the officers' conduct and the accused's characteristics." *Livers v. Schenck*, 700 F.3d 340, 352 (8th Cir. 2012). Even when "the police use overreaching tactics such as the use of threats or violence, or the use of direct or indirect promises, such promises or threats will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self-determination." *Sheets*, 389 F.3d at 778-79. "It goes without saying that the interrogation of a suspect will involve some pressure. The very purpose is to elicit a confession." *Id*. at 779.

Plaintiff admitted in his deposition that the only evidence he had of coercion was that Thompson lied, and that he did so to receive a favorable plea agreement. Even accepting that police may have used threats or promises, Plaintiff has provided no evidence or allegation indicating that Thompson's free will and capacity for self-determination was in some way overcome. *See, e.g.*, *Sheets*, 389 F.3d at 779 (finding that interrogation tactics were not coercive when a confession implicating both the defendant and a co-defendant were given after the defendant was Mirandized and in the presence of his attorney, the interviews were not long, and the defendant had time to consider the situation free of police pressure); *U.S. v. Irons*, 53 F.3d 947, 948 (8th Cir. 1995) (stating that "it is not unlawful for the Government to promise favors in return for truthful testimony," as long as the favorable treatment is not contingent upon the outcome of the trial). Thus, the Court cannot find that Defendants coerced Thompson into making a false statement against Plaintiff.

### D. BB Gun – Fabrication of Evidence

Plaintiff alleges that Defendant Norris asked the crime lab to fabricate evidence showing that Plaintiff's DNA was found at the crime scene and concealed exonerating evidence during his

investigation by telling the crime lab to not test hair and fingerprints found on the BB gun. Plaintiff alleges that Defendant Lampinen "supported and failed to reveal" this violation. Specifically, Plaintiff testified that "I had a toy BB gun . . . I've been telling them from the gate, like day one, when they charged me with the murder I had a toy gun. I didn't have a .40 Glock." (ECF No. 53-3, at 39). Plaintiff testified further that, at trial, it came out that Norris told the crime lab not to test the hair fiber that was found on the BB gun. (ECF No. 53-3, at 46). In the Statement of Facts filed alongside his sur reply, Plaintiff alleges that he "at no time possessed any firearm nor held any weapon or any object that appeared to be a weapon to the head of the Hometown Pharmacy Clerk." (ECF No. 62).

Defendants submitted the murder-trial testimony of Mary Simonson, a crime lab employee. (ECF No. 53-7). She testified that she talked with one of the prosecuting attorneys in Plaintiff's underlying criminal case about the possibility of running touch or transfer DNA on the BB gun. (ECF No. 53-7, at 137). During the discussion, it was decided that testing the BB gun "would not be probative in this case because that BB gun had been out in the elements on the rooftop for approximately nine months." (ECF No. 53-7, at 137). Ms. Simonson testified that she recommended:

> that [they] don't test it, and [the prosecutor] agreed to that; and I explained to [the prosecutor] why, like I said, about any DNA being damaged by it being out in the elements for so long. . . . As well as any possible contamination from other eyewitnesses who had handled it without gloves.

(ECF No. 53-7, at 138). Ms. Simonson further testified that, although the prosecutor brought up the question of testing, it was her expert opinion that the testing would not result in anything probative. (ECF No. 53-7, at 138).

The Court finds that Plaintiff's allegation that Defendant Norris instructed the crime lab to refrain from testing the BB gun is contradicted by the summary judgment evidence. Accordingly,

it is not necessary to address any arguments concerning whether the BB gun was, in fact, exculpatory. Likewise, it is not necessary to address Plaintiff's allegation in his Statement of Facts that he did not carry anything appearing to be a weapon, because that statement is contradicted by his own testimony and allegations that he carried the BB gun during the robbery rather than the .40 caliber handgun.

### E. First Amendment Retaliation

Plaintiff alleges that Defendant Norris retaliated against him because he engaged in a First Amendment protected activity when, as a member of the public, he attended the unrelated murder trial of his brother, Samuel Conway, in June 2011. Plaintiff alleges that Defendant Norris automatically believed he was guilty of Clark's murder because his brother had been charged with another capital murder. (ECF No. 1, at 7). No deposition testimony was submitted concerning this claim. Plaintiff alleged in his deposition that when he was served the arrest warrant for the capital murder, Defendants told him, "this is what supporting your brother gets you." (ECF No. 59, at 13).

Defendants argue that Plaintiff did not engage in any protected First Amendment activity and thus, his retaliation claim must fail. (ECF No. 52, at 24). Defendants further argue that, even assuming that Plaintiff's attendance at this brother's murder trial qualifies as a First Amendment action, Plaintiff's claim still fails because he was charged with murder before his brother's trial. (ECF No. 60, at 5-6). Defendants indicate that Plaintiff's brother is Samuel Conway, and his case was *State v. Pickney and Conway*, Case No. 26-CR-10-105. Defendants further argue Plaintiff was incarcerated for the Hometown Pharmacy Robbery on July 13, 2010, and as discussed above, there was probable cause for Plaintiff's murder arrest. They argue that Plaintiff's arrest and prosecution for murder was therefore not retaliatory.

A review of the Samuel Conway case indicates it was filed on March 5, 2010, and a jury trial was held in June 2011.[6]  Plaintiff was served the arrest warrant for the capital murder charge on January 13, 2011, while he was incarcerated for the Hometown Pharmacy robbery, several months prior to his brother's capital-murder trial.  (ECF No. 53-5).  Plaintiff did not provide any summary judgment evidence demonstrating that he had engaged in any First Amendment activity for which he was retaliated against.  Accordingly, Plaintiff's First Amendment Retaliation claim fails as a matter of law.

### F.  Racially Motivated Actions

Plaintiff alleges that Defendant Norris used racial slurs while interrogating him.  (ECF No. 1, at 3).  In his deposition, Plaintiff testified that the recording of his interrogation did not include everything that was said, and that the recording did not feature Defendant Norris using a number of slurs utilizing the word "nigger."  (ECF No. 53-3, at 22-23).  He alleged this occurred at the beginning and end of the interrogation, and that things were missing from the recording.  (ECF No. 53-3, at 23-24).  In his response, Plaintiff notes that the racial slurs are not in the recording, and suggests the tape has been tampered with.  (ECF No. 59, at 11).  He further alleges the comments were not simply racial slurs, but the following comment:  "If it's the last thing I do I'm a make sure your half nigger ass spend the rest of your life in prison."  (ECF No. 59, at 10).  In his Statement of Facts, Plaintiff alleges that Defendants Norris and Lampinen also used racial slurs when they served him with the arrest warrant for the murder of Clark.  (ECF No. 62, at 2).

Defendants provided an audio recording of Plaintiff's interrogation.  (ECF No. 53-8).  The forty-four minute and twenty-eight second audio recording was reviewed several times by the Court.  The tape begins with the entry of at least one officer into the cell, and the reading of

---

[6]  Case docket available on Court Connect, available at the Arkansas Judiciary website https://courts.arkansas.gov/online-services (last accessed Feb. 15, 2018).  Samuel Conway's conviction was reversed and remanded on appeal, and he plead guilty to several charges on March 9, 2016.

Plaintiff's rights. The Court could detect no breaks in the recording. There were no racial slurs used by the interviewer in the recording. Plaintiff provided no summary judgment evidence to support any inference of racial animus during the interrogation.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). In this case, Plaintiff has failed to provide any summary judgment evidence demonstrating that his arrest was motivated by racial animus. Thus, there is no question of material fact and Plaintiff's Fourteenth Amendment claim fails as a matter of law.

### G. Eighth Amendment Claim

Plaintiff references the Eighth Amendment in relation to several of his claims, but makes no allegations concerning cruel and unusual punishment during his incarceration. The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. Plaintiff has made no allegations that can be interpreted as a claim of cruel and unusual punishment under the Eighth Amendment. Thus, the Court finds that Plaintiff's Eighth Amendment claims fail as a matter of law.

### H. Failure to Intervene

Plaintiff alleges that Defendant Lampinen had direct knowledge of the constitutional violations Defendant Norris allegedly committed during their investigation of Plaintiff, and failed to intervene. (ECF No. 1, at 5). The deposition transcripts provided to the Court by Defendants as summary judgment evidence contain no discussion of an alleged failure to intervene. (ECF No. 53-3). In his response, Plaintiff argues that Defendant Lampinen had a duty to prevent a constitutional violation outside of the excessive force context, and failed to do so. (ECF No. 59, at 14-16).

Defendants argue that no constitutional violations occurred, therefore Defendant Lampinen had no duty to intervene. They further argue that, assuming arguendo there was a constitutional violation, the Eighth Circuit has held that outside the excessive force context, there is no clearly established law regarding a duty to intervene to prevent constitutional violations.

As previously discussed in this Memorandum Opinion, the Court cannot infer the existence of any constitutional violations in the arrest and prosecution of Plaintiff for capital murder. Further, the Eighth Circuit has clearly held that "outside of the excessive force context, there is no clearly established law regarding a duty to intervene to prevent constitutional violations." *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013). Plaintiff has made no allegation of excessive force. Therefore, the Court finds that Plaintiff's failure-to-intervene claim fails as a matter of law.

## I. Qualified Immunity

Defendants contend that they are entitled to qualified immunity on Plaintiff's claims. Plaintiff maintains that qualified immunity is inapplicable to Defendants.

Analyzing a claim of qualified immunity requires a two-step inquiry. *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012). First, the deciding court determines whether the facts demonstrate a deprivation of a constitutional right. *Id.* (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). In the second step, the court determines whether the implicated right was clearly established at the time of the deprivation. *Id.* (citing *Parrish*, 594 F.3d at 1001).

As discussed above, the Court cannot infer the existence of any constitutional violations in the arrest and prosecution of Plaintiff for capital murder by Defendants. Thus, the Court finds that it is not necessary to address the issue of qualified immunity.

## J. Official Capacity Claim – City of Hot Springs

Although Plaintiff's complaint indicates that he is suing Defendants in their official capacities, the complaint does not appear to assert an official capacity claim or allege facts in

support thereof. In his deposition, however, Plaintiff testified that the City failed to train their officers correctly. (ECF No. 53-3, at 61). Further, in his response to the instant motion, he alleges that the City failed to supervise its officers. (ECF No 59, at 21). In his Statement of Facts, Plaintiff alleges that the policies of the Hot Springs Police Department "allow[] for its officers to act unconstitutionally," and that the City failed to supervise Defendant Norris. (ECF No. 62, at 2).

As discussed above, the Court cannot infer the existence of any constitutional violations in the arrest and prosecution of Plaintiff for capital murder by Defendants. Because Plaintiff has not demonstrated that Defendants violated his constitutional rights, it follows that Plaintiff's official capacity section 1983 claims fail for lack of a constitutional violation. Thus, the Court finds that it is not necessary to address any official capacity claims based on failure to train or supervise.

## IV.  CONCLUSION

For the above-discussed reasons, the Court finds that Defendants' motion (ECF No. 51) should be and hereby is **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. A separate Judgment consistent with this Opinion will be entered.

**IT IS SO ORDERED**, this 7th day of March, 2018.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge